<u>NOT FOR PUBLICATION</u>                        [Docket Nos. 46, 47 & 48]

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

```
_____
                                 :
PIERRE REID, SR., et al.,        :
                                 :
              Plaintiffs,        :
                                 :     Civil No. 05-4885(RMB)
         v.                      :
                                 :
PATROLMAN SCOTT NELL, et al.,    :     OPINION
                                 :
              Defendants.        :
_____:
```

APPEARANCES

Erika A. Appenzeller
Jacobs & Barbone
1125 Pacific Avenue
Atlantic City, New Jersey
        Attorneys for Plaintiffs

A. Michael Barker, Esq.
Barker Scott & Gelfand
Linewood Greene - Suite 12
210 New Road
Linwood, NJ 08221
        Attorneys for Defendants Szapor, Steinman, Venuto,
        Reed, Lancaster, Bordonaro, and the Township of Egg
        Harbor, New Jersey

Steven Drake
Reynolds, Drake
P.O. Box. 345
29 North Shore Road
Absecon, New Jersey 08201
        Attorneys for Defendant Nell

Robert O. Merenich,
Gemmel, Todd & Merenich, P.A.
767 Shore Road
P.O. Box. 296
Linwood, New Jersey 08221

1

Attorneys for Defendant Mozitis

**BUMB**, United States District Judge:

**Introduction**:

This matter comes before the Court upon three different motions for summary judgment: 1) a motion by Defendant Scott Nell; 2) a motion submitted on behalf of Defendants Larry Szapor, Michael Steinman, Anthony Venuto, William Reed, Jeffery Lancaster, Michael Bordonaro, and the Township of Egg Harbor, New Jersey, and; 3) a motion for summary judgment by Christopher Mozitis.  For the reasons set forth below, this Court will grant the motion in toto filed by Defendant Nell.  This Court will grant in part and deny in part the motion filed by Szapor, Steinman, Venuto, Reed, Lancaster, Bordonaro, and the Township of Egg Harbor, and the motion filed by Defendant Mozitis.

**Factual and Procedural Background:**[1]

Plaintiff Pierre Reid, Sr., (hereinafter "Reid") and Michelle Nieves (hereinafter "Nieves") were involved in a romantic relationship for approximately a year and a half.  At the time immediately preceding the events described herein, both

---

[1] Drawn from the parties' statements of material fact submitted by the parties pursuant to Local Civil Rule 56.1 and, because this is a summary judgment motion, those facts are reviewed in the light most favorable to the non-moving party.  See Scott v. Harris, 127 S. Ct. 1769, 1774-75 (2007).

Reid and Nieves were living in Nieves' townhome located at 18 Cambridge in Egg Harbor Township, New Jersey.  On September 7, 2003, Reid and Nieves had an argument that resulted in Nieves informing Reid that she did not want to be with him anymore and that he should leave the house.  While explicitly denied by Reid, Nieves, in seeking a restraining order against Reid on September 13, 2003, reported to the Egg Harbor Township Police Department ("EHTPD") that during this argument, Reid became violent, threw her to the ground, choked her and told her he was trained to kill.  See Barker Ex. 1; Nieves Dep. Tr. 21:3-22:8.  Nieves broke free and, after going downstairs, alleged that Reid told her he had a gun and that he was going to kill her and then himself.

The next day, Nieves left for her parents home in upstate New York where she remained until September 13, 2003.  In a series of emails dated September 9, 2003, through September 12, 2003 Nieves informed Reid that "the relationship is over" and that "I will never be with someone who has threatened my life, terrorized me, and ultimately forced me to leave my home."  Drake Ex. D. at 9/9/03 email.  Nieves also made it clear that she would "obtain an order of protection as soon I get back."  Id. at 9/10/03 email.  In response, Reid stated that "[Egg Harbor Township] police is just something that I wish you would not do.  I will not listen or talk to them.  They have been unfair.  I have no fight in me, [b]ut I will not leave if they

3

are involved." Id. at 9/10/03.  Finally, on September 12, 2003,
Reid wrote "If you bring the cops to our home: It will Not be
nice.  I refuse to leave by force."  Id. at 9/12/03.

On September 13, 2003, Nieves returned to New Jersey
with her father and went to the EHTPD to file a report.  Ms.
Nieves brought two 9mm bullets with her to the EHTPD and filed a
domestic violence complaint against Reid.  Barker Ex. 1.  Officer
Nell of the EHTPD helped Nieves process her complaint and
contacted the Honorable William Cappuccio.[2]  Nieves spoke to
Judge Cappuccio directly and informed him of the events that had
taken place.  Pursuant to this conversation, Judge Cappuccio
granted a Temporary Restraining Order ("TRO") barring Reid from
contacting Nieves or engaging in actions such as harassing or
stalking.  Barker Ex. 5.  The TRO also provided a warrant to
search for and seize any weapons belonging to Reid.  Id.  Nieves
filed criminal charges against Reid for terroristic threats and
simple assault and a warrant was issued for Reid's arrest with
bail set in the amount of $2,500.00  Barker Ex. 6.  A simple
assault charge was placed in the summons.  Barker Ex. 7.

Later on September 13, 2003, Sergeant Szapor ("Szapor")
informed Patrolman Michael Boronardo ("Bordonardo") that he would

---

[2]  While Nell was involved with the paperwork leading to the
issuance of the TRO, he did not serve the TRO. Nell and Nieves
became romantically involved and were married in December of
2004.

be escorting Nieves to her townhome while she removed her belongings.  In addition, Patrolman Christopher Mozitis ("Mozitis") and Patrolman Michael Steinman ("Steinman") went to the townhouse complex.  Upon arriving, Mozitis and Szapor entered the residence to look for Reid or any weapons - neither was found.  While the officers were at the complex, Reid pulled up in a white pick-up truck accompanied by Plaintiffs, Pierre Reid Jr., Kristen Amber Reid, (both Reid, Sr.'s children) and Victor Nelson.

Mozitis approached the truck and gave verbal commands for Reid to surrender and exit the vehicle.  Reid contends that profanity was used.  Reid told the officers that he was "getting out of there until someone told him what was going on," and began to back out of the parking lot.  Reid alleges that all officers present, with the exception of Steinman, had their guns drawn as he pulled into the parking lot and that Steinman had his hand on his gun and his police K-9 with him.

After pulling away briefly, Reid returned to the parking lot and Szapor approached and explained that he was going to give Reid a restraining order and would arrest him pursuant to the warrant.  Reid exited the truck and was arrested.  Pierre Reid, Jr., Kristen Reid, and Victor Nelson were taken to the EHTPD.  Reid was later released on his own recognizance and allowed to return to the townhome with a police escort to

5

retrieve his belongings.

On September 14, 2003, the EHTPD received a criminal mischief call reporting a suspicious vehicle in the vicinity of the Cambridge Town Homes.  Barker Ex. 20.  This vehicle was described as a white pick-up truck with lettering on the side, a description that matched Reid's truck.  Id.  Szapor and Bornonaro responded to the area and pulled the truck over; Reid, Reid, Jr., and Nelson were inside the vehicle.  Around the same time, Officer Steinman arrived and executed a property check of the Cambridge Town Homes.  While there, a resident informed Steinman that he heard a pop and hissing sound from a vehicle in the lot.  Steinman's check of the area revealed that Neives' father's van had a tire that had gone flat from a puncture.  Id.  Once informed of what happened, the Honorable Robert Switzer revoked the Reid's ROR and reinstated the portion of the warrant that required Reid to post $2,500.00 bail.  See Barker Ex. 6.

On September 15, 2003, Reid called the crisis unit of the Atlantic City Medical Center and stated that he was depressed.  According to the police report, Reid threatened suicide and told the crisis counselor that he had a gun that the police did not know about.  Barker Ex. 21.  Reid denies having told the person who took the call that he had a gun, but admitted that he had consumed an unknown number of valiums and twelve beers prior to calling.  The crisis center contacted the police

6

and Officers Mozitis, Reed, Venuto, and Lancaster responded to the Tilton Garden Apartment house where Reid's truck was recently seen.  The officers then set up a loose perimeter around Reid's suspected location.  Barker Ex. 22.  At some point, Szapor arrived, though the parties dispute when this occurred.  Dispatch notified the patrol units that Reid claimed he was going to Nieves place of employment, NovaCare, to kill her and them himself.  Id.  Reid denies saying this.

The Patrolmen reported that they observed Reid talking on the cell phone and that, as they moved towards the door, they ordered him to drop to the ground while pointing weapons in his direction.  Reid avers that he heard Lancaster say that Reid had a gun in his pants and, to show the officers that he did not have a gun, pulled down his pants and underwear.  Reid avers that Lancaster doused his genitalia with mace and that Mozitis spayed mace in his face.  The officers aver that after attempts to get Reid to move or comply with their commands failed, Mozitis instructed Lancaster to spray Reid with "OC" fogger.[3]  Barker Ex. 22.  After Reid began to comply, the officers took Reid into custody and brought him to a medical facility for treatment.  The parties dispute whether Reid was actually arrested.

_____

[3] "OC" stands for Oleoresin Capsicum, better known as mace. The "fogger" is a different form of delivery - the spray travels farther and is often used for crowd control.  See Lancaster Dep. 39:14-23.

7

As a result of the charges filed on September 13, 2003,
Reid was indicted for aggravated assault in violation of N.J.
Stat. Ann. § 2C:12-1b(7), threats of violence in violation of
N.J. Stat. Ann. § 2C:12-3A, and contempt for violation of
restraining order, N.J. Stat. Ann. § 2C:29-9(B). Reid was found
guilty of a downgraded charge of inconvenient annoyance and
contempt for violation of a restraining order on March 3, 2005.
He was sentenced to one year probation.

In April and June of 2005, Reid filed criminal
complaints against officers Szapor, Mozitis, Reed, Venuto and
Lancaster stemming from his arrest on September 15, 2003 and
complaints against Szapor, Mozitis, Bordonaro and Steinman from
his arrest on September 13, 2003. Cortez Nelson filed identical
complaints on behalf of Victor Nelson, a minor who was a
passenger in the truck on September 13, 2003. On August 26,
2005, Judge Belasco held that here was no probable cause for any
criminal complaint filed by either Reid or Nelson stemming from
the September 13, 2003 or September 15, 2003 incidents. Barker
Ex. 23 & 24.

On September 12, 2005, Plaintiffs filed a complaint
against the above named defendants and Michelle Nieves.[4] In the
Complaint, Plaintiffs allege in Count One that Nell, Szapor,

---

[4] Nieves was terminated from this complaint on December 5,
2005.

8

Steinman, Mozitis, Venuto, Reed and Lancaster unlawfully arrested all Plaintiffs on September 13, 2003, without probable cause in violation of their Fourth Amendment rights.  This Count also alleges that at the time of the September 13, 2003 incident, Nell was involved in a romantic relationship with Nieves and that Nell utilized his position as a police officer to help falsely assert claims of domestic violence against Reid.  Plaintiffs claim that Nell pretended that he did not know Nieves prior to September 13, 2003 and that the other officers involved in the incidents knew the relationship existed between Nell and Nieves.  More specifically, Plaintiffs aver that Nieves and Nell "combined to perpetrate frauds upon various courts" and that the officer who arrested Reid knew the basis for the arrest was "unnecessary, invalid," and premised on an "indifference to the truth."

Count Two avers that Szapor, Steinman, Mozitis, Venuto Reed and Lancaster violated Pierre Reid, Sr.'s Fourth and Fourteenth Amendment rights when, on September 15, 2003, they surrounded Reid with their weapons, hurled "racial slurs and profanity" and, after Reid removed his clothes to prove he was unarmed, the officers began "macing him uncontrollably."

Count Three alleges that, subsequent to the above mentioned incidents, Reid and his son, Plaintiff Reid, Jr., have been subject to unreasonable and unjustified illegal contacts with various named Egg Harbor police officers for the purpose of

intimidating and threatening Plaintiffs.

Finally, in Count Four, Plaintiffs allege that the conduct and false statements of Nell and Nieves caused the initiation and continuation of prosecution against Reid "for the purpose of causing plaintiff's unlawful arrest, seizure and detention . . . ." Thus, Reid avers, pursuant to Nieves and Nell's conduct and conspiracy, Plaintiff was prosecuted without probable cause.

**Standard of Review:**

Summary judgment shall be granted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); Hersh v. Allen Products Co., 789 F.2d 230, 232 (3d Cir. 1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. See id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. See id. "In making this determination, a court must make all reasonable inferences in favor of the non-movant." Oscar Mayer Corp. v. Mincing Trading Corp., 744 F. Supp. 79, 81 (D.N.J. 1990) (citing Meyer v. Riegel Prods. Corp.,

10

720 F.2d 303, 307 n.2 (3d Cir. 1983)). "At the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249.

**Discussion:**

As an initial matter, this Court notes that Plaintiffs, in light of the discovery provided by the Defendants, have conceded that Officers Mozitis, Venuto, Reed and Lancaster were not present at the September 13, 2003 incident.  Similarly, Plaintiffs concede that Officers Steinman and Bordonaro were not present at the September 15, 2003 incident.  As such, all claims asserted in Plaintiffs' Complaint against those officers for incidents taking place on those respective dates will be dismissed.

*A) Plaintiffs' Fourteenth Amendment Claims*

As stated above, Count Two of Plaintiffs' Complaint asserts that Reid's Fourth and Fourteenth Amendment rights were violated by an unreasonable seizure and application of excessive force.  <u>See</u> Pls.' Compl. Count Two.  Reid purports to bring these claims pursuant to both the Forth and Fourteenth Amendments. This Court notes, however, that the Fourteenth Amendment is inapplicable here because it applies to pre-trial detainees.  <u>See</u>

Totton v. Keller, 205 Fed. Appx. 919, 921 (3d Cir. 2006)

(unpublished).  Any alleged excessive force applied on September

13, 2003, clearly occurred during the arrest of Plaintiff.

Therefore, only the Fourth Amendment applies.  See Abraham v.

Raso, 183 F.3d 279, 288 (3d Cir. 1999) ("we note that excessive

force in the course of an arrest is properly analyzed under the

Fourth Amendment, not under substantive due process [of the

Fourteenth Amendment].")(citing Graham v. Connor, 490 U.S. 386,

393-94 (1989)).

     With regard to excessive force alleged to have occurred

on September 15, 2003, Plaintiff argues that an issue of fact

exists as to whether he was actually arrested.  Regardless of

whether he was, in fact, arrested, there is no dispute that he

was seized and, therefore, his claims of excessive force are to

be analyzed under the Fourth Amendment only. Graham v. Connor,

490 U.S. 386, 395 (1989) (holding that "all claims that law

enforcement officers have used excessive force -- deadly or not

-- in the course of an arrest, investigatory stop, **or other**

**'seizure' of a free citizen** should be analyzed under the Fourth

Amendment and its 'reasonableness' standard, rather than under a

'substantive due process' approach.") (emphasis added); Abraham

v. Raso, 183 F.3d 279, 288 (3d Cir 1999) ("we note that excessive

force in the course of an arrest is properly analyzed under the

Fourth Amendment, not under substantive due process [of the

12

Fourteenth Amendment].")(<u>citing</u> <u>Graham v. Connor</u>, 490 U.S. 386, 393-94 (1989)).  Therefore, summary judgment will be granted in favor of all Defendants with regard to Plaintiffs' Fourteenth Amendment claims for excessive force.

The same is true of the unlawful seizure/false arrest claims Reid attempts to bring pursuant to the Fourteenth Amendment.  The Fourth Amendment provides the source of constitutional protection for Reid, and "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."  <u>See</u> <u>Sershen v. Cholish</u>, 2007 U.S. Dist. LEXIS 79627 at *27 (M.D. Pa. Oct. 26, 2007)(quoting <u>Albright v. Oliver</u>, 510 U.S. 266, 273 (1994)(internal quotations omitted).[5]  Therefore, any and all claims asserted against any Defendants pursuant to the Fourteenth Amendment will be dismissed.

*B) False Arrest*

The individual Defendants involved in the arrests/seizures contend that they are entitled to qualified

---

[5] To the extent Reid asserts a claim for malicious prosecution it appears to be asserted only pursuant to the Fourth Amendment.  <u>See</u> Pls.' Resp. SOF at 134 (clarifying the Count Four contains a malicious prosecution claim pursuant to the Fourth Amendment).

immunity on the false arrest claims.  According to the Third

Circuit, as stated in <u>Couden v. Duffy</u>, 446 F.3d 483 (3d Cir.

2005), in order to receive the benefits of said immunity:

> a court must first decide whether the facts,
> taken in the light most favorable to the
> plaintiff, demonstrate a constitutional
> violation. <u>Curley v. Klem</u>, 298 F.3d 271, 277
> (3d Cir. 2002) (citing <u>Saucier</u>, 533 U.S. at
> 201). If so, the court next determines
> whether the constitutional right in question
> was clearly established. <u>Id</u>. at 277 (citing
> <u>Saucier</u>, 533 U.S. at 201). "The relevant,
> dispositive inquiry in determining whether a
> right is clearly established is whether it
> would be clear to a reasonable officer that
> his conduct was unlawful in the situation he
> confronted." <u>Saucier</u>, 533 U.S. at 202. "If
> the officer's mistake as to what the law
> requires is reasonable," the officer is
> entitled to qualified immunity. <u>Id</u>. at 205.

<u>Couden</u>, 446 F.3d at 492.

Therefore, in evaluating the qualified immunity issue,

this Court will first ask whether the facts alleged show the

officers deprived Plaintiffs of a constitutional right.  <u>Saucier</u>

<u>v. Katz</u> 533 U.S. 194, 201 (2001).  If the answer is yes, the

Court must next ask if said right was clearly established at the

time of the events in question, i.e., in light of preexisting

law, – was the unlawfulness apparent.  <u>Wilson v. Layne</u>, 526 U.S.

603, 614-15 (1999).[6]  This task must be "undertaken in light of

the specific context of the case".  <u>Saucier</u>, 533 U.S. at 201.

---

[6]  This does not mean, however, that the same situation must
have been previously declared lawful or unlawful.  <u>See</u> <u>Couden</u>,
446 F.3d at 495.

The Court must also ask whether it would "be clear to a reasonable officer that his conduct was unlawful in the situation he confronted", id. at 202, or whether there was a "reasonable, but mistaken belief[] as to the facts establishing the existence of probable cause." Id. at 206.

A cause of action exists under 29 U.S.C. § 1983 if an arrest has been made without probable cause. Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988).  Probable cause is defined as "facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" Gerstein v. Pugh, 420 U.S. 103, 111 (1975) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).  This Court must examine whether the facts "'viewed from the standpoint of an objectively reasonable officer amount to' probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)).  Additionally, it is well established in this Circuit that "in analyzing false arrest claims, a court, to insulate a defendant from liability, need only find that '[p]robable cause . . . exist[ed] as to any offense that could be charged under the circumstances.'" Johnson v. Knorr, 477 F.3d 75 (3d Cir. 2007)(quoting Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994)).

Even where the underlying facts are disputed, the Court has a duty to make the qualified immunity determination because

"qualified immunity is an objective question to be decided by the court as a matter of law." Harvey v. Plains Township Police Department, 421 F.3d 185, 194 n. 12 (3d Cir. 2005). With this in mind, this Court turns to the required questions: (1) have Plaintiffs allege the deprivation of actual constitutional rights; and, (2) was that right clearly established at the time of the alleged violation regarding the arrest. Wilson v. Layne, 526 U.S. 603, 609 (1999).

     i) September 13, 2003

     Reid asserts that despite the fact that the officers arrested him pursuant to the temporary restraining order, warrant and allegations of domestic violence that, if the jury were to accept the facts as stated by Plaintiffs, a genuine issue of material fact exists as to whether that TRO, warrant and subsequent arrest were "based on the fraudulent conduct of Nell and Nieves." Pls.' Br. at 14.

     Taking the facts in a light most favorable to the Plaintiffs, this Court holds that even if Plaintiffs' allegations that Nell and Nieves were in a relationship prior to September 13, 2003 are to be believed, Plaintiffs have presented no evidence whatsoever demonstrating that, because of that alleged relationship, the allegations of domestic violence were based on fraud or that the TRO or warrant issued pursuant to an elaborate scheme by Nell and Nieves. Plaintiffs' speculation and

16

supposition are insufficient to defeat summary judgment.
Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d
Cir. 1999)("Once the moving party points to evidence
demonstrating no issue of material fact exists, the non-moving
party has the duty to set forth specific facts showing that a
genuine issue of material fact exists and that a reasonable
factfinder could rule in its favor.  Speculation and conclusory
allegations do not satisfy this duty.")(internal citations
omitted).

        Instead, what is clear and supported by the record is
that Nieves reported to the EHTPD complaining that she had been
the victim of domestic violence.  In support of this, she
presented two bullets and showed physical signs consistent with
her account.  Barker Ex. 1.  Judge Cappuccio then issued a TRO
and warrant pursuant to his conversation with Nieves.  The
officers, who arrested Reid pursuant to this warrant, certainly
acted with probable cause to rely upon it as Plaintiffs have
presented no evidence other than supposition that the other
officers knew that the warrant was fraudulently obtained.  See
Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir.
1995) ("only where the warrant application is so lacking in
indicia of probable cause as to render official belief in its
existence unreasonable, will the officer lose the shield of
immunity.") (internal quotations omitted).  Even Reid admitted in

his deposition that the officers had probable cause to serve the papers on him based on Nieves complaint.  Reid Dep. at 181:19-25. Thus, this Court finds that, even taking the Plaintiffs' version of the facts at true, probable cause existed to arrest Reid on September 13, 2003 and no constitutional violation occurred.

Likewise, the officers had probable cause to detain the passengers in the vehicle, Pierre Reid, Jr., Kristen Reid and Victor Nelson.  It is undisputed that these individuals were not arrested.  Moreover, it is well settled that in making a vehicle stop, a police officer executing such a stop may exercise reasonable superintendence over the car and its passengers. United States v. Bonner, 363 F.3d 213, 216 (3d Cir. 2004). Because the officers had probable cause to arrest Reid and stop the vehicle and its passengers, this Court finds that no constitutional violation for false arrest occurred on September 13, 2003.

ii) September 15, 2003

In their very brief opposition on the issue of false arrest on the 15th, Plaintiffs' only statements are that a jury must decide "whether the arrest of Reid, Sr. on that date was predicated upon false pretenses."  Pls.' Opp. Br. 15. Presumably, Plaintiffs are saying that the alleged Nell/Nieves relationship somehow undercuts the existence of probable cause. Earlier in the brief, Plaintiffs assert that there is an issue of

18

fact as to whether Reid was even arrested on that date.

Even assuming, for purposes of this motion, that Reid was arrested, this Court finds that there was probable cause to effect an arrest or seizure on the 15th. For example, Nieves had already provided the police with two 9mm bullets the night she filed her complaint. Moreover, it is undisputed that the ROR had been revoked and that the warrant was reinstated pursuant to the criminal mischief complaint. <u>See</u> Barker Ex. 6. The dispatch records show that Reid called crisis and the person at crisis, Dannielle Thornton, informed police that Reid had stated that he has a gun the police did not know about. Barker Ex. 21. Finally, the report issued by Mozitis indicates that dispatch notified patrol units that Reid claimed to be headed to kill his ex-girlfriend and then himself. <u>See</u> Barker Ex. 22. Taking all this into consideration this Court finds that probable cause existed for the officers to arrest/seize Reid on September 15, 2004.

Again, while Plaintiffs aver that there was some sort of fabrication of charges underlying the TRO and that the Nell and Nieves relationship was known by the other officers at that time, there is no evidence in the record other than Reid's own statements. Reid Dep. 141 7-15. The only evidence set forth by Plaintiffs other than Reid's self-serving statements is a transcript of a message inadvertently recorded on Reid's phone

between an officer Joseph Bonsall and a person identified only as
"Cory." Drake Ex. O. According to the transcript, the parties
to the conversation stated that Nell told one of the officers
that he "handled the call" because "he [Reid] punched her in the
middle of the night." Ex. O. Reid interprets this to mean that
he got involved in the TRO and original domestic violence
complaint because Nell and Nieves were already dating at that
time. However, it is clear that Nell did not respond to the
scene either on September 13 2003, or September 15, 2003, and
furthermore this phone message was left after September 13, 2003
(Reid Dep. at 137:4-6). Therefore, even reading the message
transcript generously, this Court cannot say that a reasonable
jury could find that Plaintiffs have demonstrated that Nell and
Nieves were dating prior to September 13, 2003. Even if one
could infer that from Plaintiffs' submission, there is no
evidence whatsoever showing that the domestic violence charge
that led to the TRO was fabricated.  Again, such supposition and
bald assertions will not defeat a well-supported motion for
summary judgment.


*C) Conspiracy*

          For the same reasons just discussed, this Court finds
that any and all claims of conspiracy asserted against Nell are
without merit. Again, the only evidence in front of this Court

that a relationship between Nieves and Nell existed prior to the incidents at issue is Reid's own testimony and a chronologically inconclusive taped phone message between persons not related to this matter.  Even if this Court were to assume, as Plaintiffs assert, that there was a relationship between Nell and Nieves at the time averred, the record is positively devoid of evidence from which a reasonable jury could find that the events of either the 13th or the 15th were in any way the product of some nefarious agreement between Nell and Nieves or Nell and the other officers to deprive Plaintiffs of their constitutional rights.  Even the full text of the voice message that Plaintiffs rely on where Officer Bonsall discusses the Nell and Nieves relationship does not support Plaintiffs' theory that there was an agreement to file a false domestic violence complaint against Reid.  See Drake Ex. O.  As such, any and all claims asserted against Defendant Nell and/or the other officers will be dismissed.

D) *Excessive Force*

i) September 13, 2003

It is undisputed that the only "force" applied on the date of this incident was the officers' drawn guns and presence of the police K-9.  Plaintiffs aver that summary judgment is improper because there is an issue of fact as to whether the Defendants were "entitled to use the amount of force they did . .

. ."  Pls.' Br. at 4.  While Plaintiffs state that the only officers involved were Defendants Bordonaro, Steinman and Szapor, Pls' Br. at 4. n.1, that appears to be an inadvertent mistake, as Defendant Mozitis was admittedly present.  Thus, any analysis will include the allegations made against Mozitis in the Complaint.

Because the Defendants assert a qualified immunity defense, this Court will follow that line of analysis set forth above and first ask whether the facts alleged show that the Defendant deprived Plaintiff of a constitutional right.  Saucier v. Katz 533 U.S. 194, 201 (2001).  In addressing the issue of excessive force, the Court must first ask whether "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." Graham v. Connor, 490 U.S. 386, 397 (1989).  Factors to be considered include whether the suspects are "actively resisting arrest or attempting to evade arrest by flight." Id. at 396.  Other factors include: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, the duration of the confrontation, the context of the arrest, whether the suspect may be armed and the number of people the police are confronting at the time.  Green v. New Jersey State Police, 246 Fed. Appx. 158, 161 (3d Cir. 2007).

The Court is to examine the alleged conduct from "the perspective of 'a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" <u>Davis v. Twp. of Paulsboro,</u> 421 F. Supp. 2d 835, 854 (D.N.J. 2006) (quoting <u>Graham</u>, 490 U.S. at 396). Moreover, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' is constitutionally unreasonable[.]". <u>Id.</u> Finally, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." <u>Graham v. Connor</u>, 490 U.S. at 396-97.

Even taking the facts asserted by Plaintiffs as true, i.e., that the Officers had their "weapons drawn and pointed at [Reid], as well as the children within [Reid's] vehicle . . . [that] Szapor yelled to [Reid] to 'get out of the f—ing truck, as he and all the officers approached [Reid's] pickup truck with guns trained at their heads," see Pls.' Compl. at 1, and the admitted presence of the police K-9, this Court finds that there was no constitutional violation via application of excessive force.[7]

_____

[7] According to the Attorney General's Use of Force Policy, Pls.' Ex. O, "[p]ointing a firearm at a subject is an element of constructive authority to be used only in appropriate situations." Constructive authority is defined as authority that does not involve physical contract but involves the use of an

While Plaintiffs argue that the officers did not
believe Reid was a threat and that the officers did not search
the truck for weapons, it is clear that the officers responding
to the scene had been informed that they were serving a TRO in a
domestic violence case and that Reid was potentially armed.
Moreover, once confronted by the officers, it is undisputed that
Reid initially fled the scene before returning to be served by
the officers.

This Court, taking into consideration the totality of
circumstances that existed on the night of September 13, 2003:
the belief that Reid was armed, the fact that the officers were
responding to a domestic violence complaint, that Reid initially
left the scene, the fact that the officers were effecting an
arrest, and the relatively short duration of the incident all
lead this Court to find that the actions of the officers do not
rise to a Fourth Amendment violation. See Sharrar v. Felsing,
128 F.3d 810, 822 (3d Cir. 1997)(stating that relevant factors
include "the possibility that the persons subject to the police
action are themselves violent or dangerous, the duration of the
action, whether the action takes place in the context of
effecting an arrest, the possibility that the suspect may be
armed, and the number of persons with whom the police officers

---

officers authority to exert control over a subject.  Id.

must contend at one time.").

　　　　While not dispositive, as each excessive force claim must be examined based on a totality of the particular circumstances, comparison with other excessive force cases is helpful.  In <u>Sharrar v. Felsing</u>, 128 F.3d 810 (3d Cir. 1997), the excessive force alleged included the police surrounding suspects, believed to have beat up a woman in her apartment, with pointed shotguns.  Once these suspects came outside, they were ordered to lie face down in the dirt and the police yelled and threatened to "blow [their] brains out."  While the Third Circuit held that the display of force for an alleged domestic assault appeared "extreme," it nevertheless found that the guns to the heads of the suspects and vulgar threats were not "constitutionally excessive, even though they cause Plaintiffs' discomfort and humiliation."  <u>Id.</u> at 821.

　　　　Based on the information and series of events leading up to the service of the TRO, this Court finds that "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." <u>Graham v. Connor</u>, 490 U.S. 386, 397 (1989).  The excessive force claim arising from September 13, 2003 will be dismissed.

ii) September 15, 2003[8]

With regard to the September 15, 2003 incident, Plaintiffs aver that there is an issue as to whether the amount of force used was reasonable because the parties have different versions of whether Plaintiff was complying with the officers' demands and whether the OC fogger normally used for crowd control was excessive when used on a single person.[9]  Additionally, Plaintiff contends that he was sprayed with mace in his face, on his genitalia and buttocks, which Reid contends was excessive in light of the circumstances.

Because the Defendants assert a qualified immunity defense, this Court must first ask whether the facts, as stated by Reid, constitute a constitutional violation.  Reid admittedly contacted the crisis unit of the Atlantic City Medical Center because he was feeling depressed and, after being asked repeatedly told the crisis worker, "I am suicidal, is that – are you going to help me now?" Reid Dep. at 192:4-5.  Reid admitted that he had consumed twelve beers and took eight Valium that night.  Id. at 197: 10-19.  After Reid realized that the crisis center had contacted the police he exited the apartment and heard

_____

[8] There were no other Plaintiffs present or involved on this date, therefore Reid is the only Plaintiff who may assert claims for this date.

[9] Plaintiffs admit that Steinman and Bordonaro were not present that day, therefore any claims asserted against them based on that date will be dismissed.

the officers saying get on the ground and put your hands up.
Reid, Dep. at 210:13-26.  Despite being told to get on the
ground, Reid states that he did not do so.  Id. at 210:17-19.
Reid testified that he heard Lancaster say he had a gun and that
the officers started putting shotguns closer to him.  Id. at
212:17-213:2.  Then, to show the officers that he did not have a
gun, he dropped his pants and underwear.  Following this,
Lancaster allegedly sprayed mace on Reid's private area and
Mozitis sprayed him on the face.  Id. at 215:1-9.  Reid alleges
that after he was sprayed, he told the officer to "knock it off"
and that they continued to spray him .  Id. 215:13-17.  He also
avers that while this was taking place, Szapor said "if the
nigger don't want to get down, mace his A-S-S again."  Id. at
215:18-20.  Reid further avers that when he bent down to pull up
his pants, Lancaster sprayed his buttocks with mace.  Id. at
216:1-4.

        According to Officer Lancaster, he did spray Reid with
the OC "fogger" which "travels farther and contains more" than
the standard spray form of mace.  Lancaster Dep. 39:14-20.
Lancaster avers, however, that he sprayed Reid in the face only
and did so at Mozitis' direction.  Id. at 39:2-9; 43:16-17.
Lancaster explicitly denies spraying Reid anywhere below the
waist and completed a use of force report after the incident.
Merenich Ex. S.  Officer Mozitis testified that he had his 40

caliber lugger carbine with him that night and that he ordered
Lancaster to spray Reid with the fogger.  Mozitis Dep. 95:16-25.
Mozitis also testified that Reid did not remove his pants before
he was fogged.  Id.

Turning to an analysis of the excessive force
allegations, the first step requires this Court to take the facts
in a light most favorable to the Reid and determine whether the
actions of any of the officers deprived Plaintiff of a
constitutional right.  As stated above, Reid avers that Lancaster
sprayed his genitals and buttocks with mace even after Reid had
removed his clothing to demonstrate that he did not have a
weapon.  He also avers that Reid sprayed his face even though he
had his hands in the air and lowered his clothing to show he was
unarmed.  It is undisputed, however, that the officers responding
to the call from crisis had been told that Reid might be armed
and might harm himself and his girlfriend.  Taking the facts
alleged in a light most favorable to Plaintiff, this Court
concludes that Lancaster and Mozitis violated Plaintiff's
constitutional rights via excessive force.  See Graham v. Conner,
490 U.S. 386, 395 (1989)(stating that the use of excessive force
is an unlawful "seizure" under the Fourth Amendment).[10]

_____

[10]  This does not mean that after the factual disputes are
resolved that this Court will find the Defendants' actions
unreasonable.  If a jury were to believe the officers' version of
events only, the Court could conclude that no violation of
constitutional rights occurred.  At this juncture however,

28

The constitutional right at issue was "clearly established under the qualified immunity test." Couden, 446 F.3d at 497. "To conclude that a right is 'clearly established' 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Green, 246 Fed. App. at 162 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). This Court does not doubt that if the facts are as Reid states, that he had demonstrated that he was unarmed, that spraying mace on his genitalia and buttocks was excessive would be sufficiently clear to a reasonable officer.

The next question is whether the officer made a reasonable mistake as to what the law requires in light of the totality of circumstances. If Reid's account is credible, a reasonable officer at the scene would not think it reasonable to repeatedly spray mace on Reid's, face, genitals and buttocks after he pulled down his pants and revealed that he did not have a weapon and was clearly outnumbered by the officers who had their guns drawn.  See Counden, 446 F.3d at 496-97 (discussing relevant factors to be considered).

The Court notes, however, that Lancaster has stated

_____

Plaintiffs' allegations, if proved, constitute excessive force. See Green, 246 Fed. Appx. at 161 (discussing excessive force claims where factual issues needed to be resolved by a jury in order to determine whether the officers' actions were reasonable under the circumstances).

that he did not spray Reid below the waist, that he did so based on Mozitis' order and sprayed the fogger "until it was empty." Lancaster Dep. 52:19-23.  There is no mention of sprays to the genitals or buttocks in Lancaster's account of the facts.  Id. According to Mozitis, he did not spray Reid at all, but merely instructed Lancaster to spray Reid when he failed to comply with their demands and began to "make motions into his waistband." Mozitis Dep. 94:5-11.  Obviously, if Lancaster and/or Mozitis' version is credible, it would impact this Court's analysis of the reasonableness of this conduct.

The Third Circuit has made clear that "while we have recognized that it is for the court to decide whether an officer's conduct violated a clearly established constitutional right, we have also acknowledged that the existence of disputed, historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue." Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002).  Once all historical disputed facts have been resolved, the Court can determine the officers' objective reasonableness.  Id. at 282 (finding that district court erred in deciding disputed historical fact relevant to qualified immunity ruling and stating that the issue should have been resolved by a jury).

At this juncture, this Court is unable to resolve the qualified immunity question without resolution of the underlying

30

disputed factual issue of whether Plaintiff was actually sprayed in the genital and buttock areas and whether he was sprayed by both officers or just Lancaster.   See Monteriro v. City of Elizabeth, 436 F.3d 397, 405 (3d Cir. 2006)("[a]lthough qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury").   Therefore, this Court will deny summary judgment on this charge and resolve the underlying issues of fact by means of special interrogatories to a jury.   See Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004) (discussing use of special interrogatories to allow juries to resolve disputed historical facts material to the qualified immunity question).   In light of this, the Court will deny the motions for summary judgment as they pertain to claims of excessive force allegedly applied by Mozitis and Lancaster.

        The only other excessive force allegations that appear to have been asserted against the other officers present are for the constructive force asserted via drawn weapons.   The Court finds, however, that even taking the facts as asserted by Reid, this display of constructive force was not excessive because Reid was being approached pursuant to a crisis call and the crisis center had informed the officers that Reid might be armed and a harm to himself and others.

E) *Intervene/Excessive Force*

Plaintiff says there is an issue of material fact as to whether, on either incident date, the other officers failed to intervene to prevent a constitutional violation. Relying on case law from the Second Circuit, Plaintiffs aver that the officers who did not apply force are nonetheless liable for failing to prevent the application of the alleged excessive force. Because this Court has already determined that no excessive force was applied on September 13, 2003, the Defendants cannot be held liable for failing to intervene on this date and that claim will be dismissed.

With regard to September 15, 2003, this Court has found that a material issue of fact remains exists as to whether excessive force was applied by Mozitis and Lancaster on September 15, 2003. Thus, this Court must ask whether an issue of fact remains regarding a failure to intervene by the other officers present: Szapor, Reed and Venuto. Because it is possible that once the jury resolves the underlying factual questions regarding excessive force, that this Court will grant summary judgment to the remaining Defendants based on qualified immunity, this Court cannot definitively reach this issue at this time. Defendants' motion will be denied without prejudice as to the September 15, 2003 incident.

F) *Malicious Prosecution*

While Plaintiffs' Complaint contains claims of malicious prosecution and the Defendants move for summary judgment on the same, Plaintiffs brief in opposition does not appear to refute Defendants assertions that Plaintiffs cannot demonstrate a prima facie case of malicious prosecution. Because this portion is unopposed and Defendants' arguments are well supported, summary judgment will be granted. <u>See</u> <u>Local 825 v. Tuckahoe Sand & Gravel</u>, 2007 U.S. Dist. LEXIS 44613 at * 29-30 (D.N.J. June 20, 2007) (collecting cases supporting the proposition that failure to oppose constitutes abandonment of a claim).

To prove malicious prosecution under Section 1983 when the claim is brought pursuant to the Fourth Amendment, a plaintiff must show that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. <u>Johnson v. Knorr</u>, 477 F.3d 75, 85 (3d Cir. 2007) (quoting <u>Estate of Smith v. Marasco,</u> 318 F.3d 497, 521 (3d Cir. 2003)).  To succeed, a plaintiff must meet all of the above listed elements.

33

As correctly stated by Defendants, the criminal proceedings in this matter were initiated by Michelle Nieves, not the Defendant officers.  It was Nieves' statements to Judge Cappuccio that resulted in the issuance of the TRO and Nieves filed criminal charges against Reid.  Because Plaintiffs have set forth no evidence that any of the Defendant officers initiated criminal proceedings against Reid, the malicious prosecution claims fail.

*G) Monell Claim*

Plaintiffs contend that Egg Harbor Township is liable for the excessive force applied because, according to Plaintiffs, a supervisor within the Police Department instructed a subordinate to use excessive force and because there are issues of fact as to whether the Township had a policy of serving TROs at gunpoint or using an OC fogger on an individual.  Additionally, Plaintiffs argue "[i]f the jury accepts Plaintiffs' version of events that the defendant officers were aware of a relationship between Defendant Nell and Nieves prior to serving the Temporary Restraining Order . . .  Egg Harbor Township can be held liable for allowing such a custom or policy to exist by failing to adequately supervise its officers."

Local government units generally are not liable under § 1983 solely on a theory of respondeat superior.  See City of

34

Oklahoma City v. Tuttle, 471 U.S. 808, 824 n. 8 (1985); Monell v.
Dep't of Soc. Servs., 436 U.S. 658, 690-91, 694 (1978) (municipal
liability attaches only "when execution of a government's policy
or custom, whether made by its lawmakers or by those whose edicts
or acts may fairly be said to represent official policy, inflicts
the injury" complained of); Natale v. Camden County Corr.
Facility, 318 F.3d 575, 583-84 (3d Cir. 2003).  The Supreme Court
in Monell created a two path track to municipal liability under
section 1983.  As set forth by the Third Circuit:

> A government policy or custom can be established
> in two ways.  Policy is made when a "decision
> maker possessing final authority to establish
> municipal policy with respect to the action"
> issues an official proclamation, policy or edict.
> A course of conduct is considered to be a "custom
> when, though not authorized by law, such practices
> of state officials [are] so permanent and well
> settled" as to virtually constitute law.

Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir.
1990).

Furthermore, custom may be established by evidence of
knowledge and acquiescence.  See Fletcher v. O'Donnell, 867 F.2d
791, 793 (3d Cir. 1989).  The key to holding a municipality
liable under a custom theory is that the policymaking official
knew, or should have known, about the illegal practices, and
therefore, tacitly authorized a custom of tolerating their
officers' supposedly illegal activities.  See Beck v. City of
Pittsburgh, 89 F.3d 966, 973 (3d Cir. 1996) (discussing tacit

authorization of excessive force); <u>Allen v. City of Philadelphia</u>,
1997 WL 587366 (E.D. Pa. 1997).  Moreover, unless the policy or
custom at issue is, itself, unconstitutional, courts have
generally held that "more proof than [a] single incident will be
necessary . . . to establish both the requisite fault on the part
of the municipality and the causal connection between the
'policy' and the constitutional deprivation."  <u>City of Oklahoma
City</u>, 471 U.S. 808, 824 (1985).   Finally,

> it is not enough for a § 1983 plaintiff merely
> to identify conduct properly attributable to
> the municipality. The plaintiff must also
> demonstrate that, through its deliberate
> conduct, the municipality was the "moving
> force" behind the injury alleged. That is, a
> plaintiff must show that the municipal action
> was taken with the requisite degree of
> culpability and must demonstrate a direct
> causal link between the municipal action and
> the deprivation of federal rights.

<u>Bd. of the County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397,
404 (1997).

     With regard to the excessive force issues, Plaintiffs
have presented no evidence whatsoever that there exists a custom
or policy within Egg Harbor to serve TROs at gunpoint or to use
an OC fogger on an individual.  As to the Nell/Nieves
relationship, even assuming *arguendo* that Plaintiffs have shown a
relationship existed prior to September 13, 2003, they have
utterly failed to demonstrate that, pursuant to the relationship,
Nieves and Nell conspired to deprive Plaintiffs of their

constitutional rights <u>because</u> they were not properly supervised.
Thus, Plaintiffs have failed to demonstrate that in any way Egg
Harbor was the "moving force" behind their injuries.  <u>See</u> <u>Bryan</u>
<u>County v. Brown</u>, 520 U.S. at 404.  As such, this Court finds that
no issue of fact remains as to whether any custom, policy or
practice of Egg Harbor resulted in Plaintiffs' alleged injuries
and, therefore, all claims against Egg Harbor Township are
unfounded and should be dismissed.


*H) Harassment/Tort Claims*

        Count Three alleges that, subsequent to the above-
mentioned incidents, Reid and his son, Reid, Jr., have been
subject to unreasonable and unjustified illegal contacts with
various named Egg Harbor police officers for the purpose of
intimidating and threaten Plaintiffs.  Construing this claim
closely to how it was plead, as one of harassment, this Court
notes that it is unclear exactly who Plaintiffs have brought this
claim against, what legal theory it is asserted pursuant to, or
specific facts or incidents that the claim is based on.

        In an attempt to deal with this claim efficiently,
Defendants Szapor, Steinman, Venuto, Reed, Lancaster, Bordonaro,
and the Township of Egg Harbor, New Jersey, have moved for
summary judgment to the extent the claim might be asserted as a
tort claim of harassment.  Defendants aver that the claim fails

37

because Plaintiffs have failed to file the requisite Notice of Claim pursuant to the New Jersey Tort Clams Act, N.J. Stat. Ann. § 59:1-1 et seq.  As it appears from the evidence presented by Defendants, that no such notice was filed, see Barker Ex. 28, and Plaintiffs present no opposition to this argument, any tort claim will be dismissed.

Moreover, to the extent the Plaintiffs have attempted to assert some sort of constitutional claim of harassment, the legal or factual basis fo such a claim has not been adequately set forth.  Plaintiffs do not make any attempt in their opposition to the summary judgment motions to expound on this claim or oppose the motion for summary judgment.  It will, therefore, be dismissed.  See Evans v. Chichester Sch. Dist., 533 F. Supp. 2d 523, 536 (E.D. Pa. 2008) ("Courts have nearly unanimously required more than conclusory allegations of deprivations of constitutional rights.").

**Conclusion:**

For the reasons set forth above, all claims asserted against Defendants Nell, Steinman, Bordonaro and the Township of Egg Harbor New Jersey are dismissed.  Furthermore, all claims for false arrest, conspiracy, harassment and excessive force allegedly applied on September 13, 2003 and failure to intervene on September 13, 2003 are dismissed as to all Defendants.  The

only claims that remain in this case are the excessive force claims asserted against Mozitis and Lancaster based on the September 15, 2003 incident.  A jury must resolve the underlying factual disputes before this Court can properly discussed the qualified immunity issue.  Moreover, because the outcome of the excessive force claim will impact Plaintiffs' claim for failure to intervene during the September 15, 2003 incident, Defendants motion for summary judgment on this point will be denied without prejudice.

An appropriate Order will issue this date.


Dated: June 3, 2008                    s/Renée Marie Bumb
                                       RENÉE MARIE BUMB
                                       UNITED STATES DISTRICT JUDGE